IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

CITY OF DARDANELLE and YELL
COUNTY WILDLIFE FEDERATION, INC.                    PLAINTIFFS

v.                              No. 4:14-cv-98-DPM

DEPARTMENT OF TRANSPORTATION;
FEDERAL HIGHWAY ADMINISTRATION;
ARKANSAS STATE HIGHWAY &
TRANSPORTATION DEPARTMENT;
RIVER VALLEY REGIONAL INTERMODAL
AUTHORITY; and DEPARTMENT
OF DEFENSE, United States Army
Corps of Engineers, Little Rock District            DEFENDANTS

ORDER

1.    **Summary.**  Twenty-one years ago, the city of Russellville
began planning construction of a commercial slack water harbor on the
Arkansas River.  The harbor was part of a bigger venture—the River
Valley Intermodal Facilities Project—to create a meeting place for
water, highway, and railroad commerce.  The Project was intended to
bring good jobs, new industries, and more tax revenue to the area.
Things started smoothly.  Russellville and Pope County formed the
River Valley Intermodal Authority to sponsor and develop the Project.
The Federal Highway Administration had also agreed to provide some
money.   At Russellville's request, the Army Corps of Engineers

prepared an Environmental Assessment and, later, a Finding of No Significant Impact for the proposed harbor.

The wheels came off when this Court enjoined the Project. *See* Order № 32 in Case No. 4:03-cv-176-BRW. Speaking through Judge Billy Roy Wilson, the Court ruled that the Corps had violated NEPA by preparing the EA and FONSI with only the harbor, and not the other components, in mind. The Project as a whole needed an Environmental Impact Statement, which, by then, FHWA was already working on. Over the next decade, FHWA published a draft Environmental Impact Statement, a supplemental draft Environmental Impact Statement, and a final Environmental Impact Statement—all prepared by Parsons Infrastructure and Technology Group. Parsons is a private contractor, which the Authority had hired in 2004 to help develop the intermodal facilities. In 2016, FHWA issued a Record of Decision documenting its plan to develop the Project on a several-hundred-acre tract in the Russellville Bottoms: the "Green Alternative." The Corps later issued its own Record of Decision adopting FHWA's final Impact Statement.

Dardanelle and the Yell County Wildlife Federation have sued the federal and state agencies involved in the Project, and the Intermodal Authority. Dardanelle sits on the south bank of the Arkansas River— directly across from the Russellville Bottoms. The Wildlife Federation is a non-profit group of environmentalist Arkansawyers. (From now on, the Court will call the Plaintiffs "Dardanelle" and the federal

Defendants "FHWA.") The complaint targets three NEPA documents: 1) FHWA's final Environmental Impact Statement; 2) FHWA's Record of Decision; and 3) the Corps' Record of Decision. Dardanelle argues that these documents are invalid under NEPA for several reasons. First, Dardanelle says that FHWA violated the statute by allowing the Intermodal Authority to choose Parsons to prepare the NEPA documents, instead of choosing Parsons (or another contractor) itself. That violation, according to Dardanelle, biased the NEPA process in favor of locating the Project in the Authority's home field, Russellville. Next, Dardanelle challenges FHWA's analysis of alternative locations, as well as the possibility of not building the Project at all. Last, Dardanelle says that FHWA didn't properly consider the Project's environmental effects.

All the parties have moved for judgment on the administrative record.* The Court held a hearing on the pending motions. Counsel's good arguments revealed that the record was missing an essential document: a statement disclosing whether Parsons has any financial or other interest in the Project's outcome. NEPA's implementing regulations require such a statement. 40 C.F.R. § 1506.5(c). During the hearing, FHWA's lawyers obtained what they thought was the

---

* The Arkansas State Highway & Transportation Department and the Intermodal Authority have adopted the federal Defendants' cross-motion and briefs. *E.g.,* № 136 & № 137.

required disclosure statement: a "certification of consultant" appended to the 2004 contract between the Authority and Parsons. The contract also had a separate appendix with certifications by the Authority. On FHWA's unopposed motion, the Court added the contract, with the certifications, to the administrative record. № 164. But, after reviewing the certifications, the Court concluded that they didn't meet the regulatory standards. № 164 at 3. The Court ordered FHWA to get a compliant statement from Parsons, or, if a conflict existed, decide on responding measures. № 164 at 5. FHWA has since filed a "confidential disclosure statement" by Parsons's vice president, which FHWA wants added to the administrative record. № 170-1. With the benefit of the parties' helpful supplemental briefing, and their earlier papers and oral argument, this case is at last ready for decision.

**2.     Administrative Record.**   Dardanelle asks the Court to reconsider the part of its March 2018 Order directing FHWA to get a compliant disclosure statement from Parsons. № 164 at 5. It says that, because no disclosure statement existed when the agency decided on the Project, the belated statement can't be added to the administrative record now. № 167 & № 168. Dardanelle is correct that judicial review under the Administrative Procedures Act is generally limited to the record the agency had when it made its decision. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). The rule is not absolute, though. As FHWA points out, a court may consider extra-

record evidence where additional explanation of the agency's decision is "the only way there can be effective judicial review." *Voyageurs National Park Association v. Norton*, 381 F.3d 759, 766 (8th Cir. 2004). In the peculiar circumstances presented, this exception applies. Supplementation isn't ideal, but it's the only way the Court can effectively decide the deep issue—namely, bias—in Dardanelle's complaint. The motion to reconsider, № 167, is therefore denied. The administrative record is deemed supplemented with the confidential disclosure statement, № 170-1.

3. **Selection of Parsons.** The Authority's selection of Parsons Engineering to prepare the Environmental Impact Statement about all three parts (harbor, rail, and highway) of the planned intermodal facilities violated the National Environmental Policy Act. The statute, as amended, requires the lead federal agency to do the statement. 42 U.S.C. § 4332(C). The now-venerable implementing regulations issued by the Council on Environmental Quality echo this requirement, adding that the lead agency can hire a contractor to prepare the statement. 40 C.F.R. § 1506.5(c). No one disputes that possibility. The Department of Transportation regulations on point further expand the universe of those who can prepare an Impact Statement: states, cities, and governmental bodies with state-wide jurisdiction can do so. 23 C.F.R. § 771.109(c)(2) & (c)(5). The Authority, though, isn't any of these things. The Authority is the applicant for federal funding for this

Project. And the DOT regulations allow the applicant to prepare an Environmental Impact Statement. 23 C.F.R. § 771.109(c)(5). That didn't happen, either: the Authority didn't do the study this Court ordered in 2004; it hired Parsons to do it. And this is not a case where the record is murky about exactly who selected the contractor. *Compare Communities Against Runway Expansion, Inc. v. Federal Aviation Administration*, 355 F.3d 678, 686 (D.C. Cir. 2004). The Authority did.

Does the improper selection of Parsons make the Impact Statement invalid? No. With hindsight, it's clear that the error didn't compromise the "objectivity and integrity of the NEPA process." *Utahns for Better Transportation v. U.S. Department of Transportation*, 305 F.3d 1152, 1186 (10th Cir. 2002); *Citizens Against Burlington, Inc. v. Busey IV*, 938 F.2d 190, 202 (D.C. Cir. 1991). The Court is satisfied, based on the new disclosure statement, that Parsons has no "financial or other interest in the outcome of the [P]roject" resulting from its contractual relationship with the Authority. 40 C.F.R. § 1506.5(c). Dardanelle points to e-mails that, it says, show FHWA's lack of control over Parsons's NEPA work. For instance, Randall Looney, who was FHWA's Environmental Coordinator, wrote to one of his FHWA colleagues:

I had some 80 odd comments on the first draft [of the supplemental draft impact statement] and [Parsons] chose not to address some less than 20 of them, but didn't provide a reason why until after we went back to them and told them to fix it.

FHWA AR 008796. The colleague responded, "Okay—just let me know—it is all crazy!" *Ibid.* Dardanelle says FHWA's inability to corral Parsons eventually led Looney to suggest that FHWA give up on the Project altogether. FHWA AR 010118–0119.

It's undeniable that, on this record, FHWA was at times frustrated with Parsons and the Authority. But FHWA didn't give up—it kept pushing for more and better evaluation of the Project. In the same e-mail that's quoted above, Looney went on to say this: "Parsons does not (will not) understand that this is an FHWA document and will not be approved until they have it like we need it to be." FHWA AR 008796. And consider excerpts from other Looney e-mails:

- [W]e need to let [Parsons] know that the Intermodal Board is not driving the schedule on this project. We **WILL** complete a sufficient environmental study on this project or the document will not be approved by FHWA . . . and they will not get a ROD. Both the Intermodal Board and Parsons need to understand this.

- [W]e need to refine the alternatives selection portion of the EIS . . . . We need to verify that the location . . . as proposed[] is in fact THE BEST location for the facility with respect to project purpose and need. . . . It will be extra work up front for Parsons, and possibly cost more, but I believe this preliminary work needs to be done to verify that the facility as proposed is in the best location.

FHWA AR 006848 (emphasis original); FHWA AR 002766 (emphasis original). All material things considered, the record doesn't establish that FHWA failed to supervise the preparation of the Impact Statement, or that Parsons or the Authority hijacked the NEPA process. The record shows, instead, that FHWA exercised plenty of independent oversight during a sometimes adversarial but ultimately objective evaluation of the Project's effects on the environment.

**4. Alternatives Analysis.** The Impact Statement's alternatives analysis was sufficient under NEPA. The law requires FHWA to "[r]igorously explore and objectively evaluate all reasonable alternatives" to the Project. 40 C.F.R. § 1502.14(a); 42 U.S.C. § 4332(C)(iii). Reasonableness is tethered to the Project's purpose—a "proposed alternative is reasonable only if it will bring about the ends of the federal action." *Burlington*, 938 F.2d at 195. According to the Impact Statement, the purpose of this Project "is to establish collocated intermodal facilities in the A[rkansas] R[iver] V[alley]." FHWA AR 011110. With that purpose in mind, FHWA first

looked for tracts of suitable land in the river valley. It found nine candidates, shown in this map. FHWA AR 011190.

Figure 3.1. Overview Map of Alternative Locations Considered for Inclusion in the River Valley Intermodal Facilities EIS.



Using several screening criteria, FHWA next eliminated tracts that couldn't reasonably host the planned intermodal facilities. The criteria included, for example, access to highway, rail, and river; a contiguous layout; proximity to a navigable channel of the Arkansas River; a 700-acre-minimum tract; and suitable topography. FHWA AR 011185. Out of the nine tracts, three survived screening. Appendix A shows maps of the three finalists, which FHWA called the Red, Purple, and Green Alternatives. More evaluation of the three finalists occurred.

In the end, FHWA designated the Green Alternative—an 882-acre tract of bottomland in Russellville along the north bank of the Arkansas River—as the preferred location for the Project.

Dardanelle's core argument is that FHWA, through the Intermodal Authority and Parsons, manipulated the alternatives analysis from the start to land the Project in Russellville. Dardanelle cites record evidence that, while the Project was being evaluated, Russellville was buying up land in the Red and Green locations for the intermodal facilities. FHWA AR 007054. There are also telling letters from 2004, wherein Parsons described the planned Project as having "highway connections via State Highway 7, and access to the Dardanelle Russellville Railroad development." FHWA AR 002608. In Dardanelle's view, Parsons could just as easily have said the Project would be located in the Russellville Bottoms. And when it was time to evaluate competing alternatives, Dardanelle maintains, FHWA defined-away the non-Russellville sites by selectively applying the screening criteria and by treating three variations on one tract as separate alternatives.

"If NEPA mandates anything, it mandates this: a federal agency cannot ram through a project before first weighing the pros and cons of the alternatives." *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664, 670 (7th Cir. 1997). Although the Court is deferential to the agency's choice of reasonable alternatives, the agency cannot "slip past the

strictures of NEPA [by] . . . defin[ing] competing 'reasonable alternatives' out of consideration[.]" *Simmons*, 120 F.3d at 666. Stated another way, NEPA doesn't "give agencies license to fulfill their own prophecies." *Burlington*, 938 F.2d at 196. Though Dardanelle raises real concerns, for several reasons the Court is not persuaded that bias improperly predetermined the Project's location.

First, the Court agrees with Dardanelle that the Green, Red, and Pink tracts are much the same. They're not identical, though, and FHWA has given reasons for evaluating them separately. It says the tracts have different boundaries and terrain, and that there are different environmental and social impacts of locating the Project on each. FHWA's reasoned decision to separate the alternatives is entitled to some deference. *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1128 (8th Cir. 1999). And even if these three are essentially one alternative, FHWA had another solid finalist: Purple. So, the Court can't say that a Russellville location was always locked in.

Second, Dardanelle is right that the Authority believed, and even hoped, from the start that the intermodal facilities would end up in Russellville. The Court sees nothing unlawful about that hunch—it would be imprudent for the main booster not to have at least a hip opinion about the best site for this Project. And the eventual selection of the Russellville Bottoms is, without more, innocuous. "NEPA mandates a searching inquiry into alternatives, but says nothing about

- 11 -

which to choose." *Simmons*, 120 F.3d at 666. Dardanelle hasn't shown a better-suited, non-Russellville location that FHWA rejected for some empty reason. Plus, one of the three finalists, the Purple Alternative, isn't in Russellville—it's up the river near Knoxville. FHWA AR 008947, 8953. FHWA looked hard in good faith at alternatives; and it gave detailed reasons for choosing the Russellville Bottoms over other feasible locations. That's all NEPA requires. *Friends of the Boundary Waters*, 164 F.3d at 1128.

Last, geography and logistics, not bias, constrained the alternatives analysis. The goal was to build intermodal facilities, which can't be done without good access to water, roads, and rail. FHWA can't move the Arkansas River or the Ozark Mountains. It can't reasonably build a new railroad or interstate. Those constraints, coupled with this Project's goals, necessarily drove the selection of alternatives.

Dardanelle makes a side argument that FHWA's handling of the no-action alternative was conclusory. A few parts of the Impact Statement make the circular point that no action will have no impact. But a no-action analysis doesn't violate NEPA merely because it briefly states the self-evident. *Oregon Natural Resources Council v. Lyng*, 882 F.2d 1417, 1423 n.5 (9th Cir. 1989). Other parts of the Impact Statement—which incorporate sections of the supplemental draft

Impact Statement—meaningfully consider the no-action alternative. *E.g.*, FHWA AR 011219.

5. **Environmental Impacts Analysis.** It was adequate. 42 U.S.C. § 4332(C)(i); *Baltimore Gas & Electric Co. v. NRDC, Inc.*, 462 U.S. 87, 97 (1983). Judicial review on this issue is limited. "[T]he only role for a court is to insure that the agency has considered the environmental consequences; it cannot interject itself within the area of discretion of the executive as to the choice of the action to be taken." *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227–28 (1980) (*per curiam*) (quotations omitted). All that's required is a "hard look," evidenced by a "reasonably thorough discussion" of the likely environmental effects. *Friends of the Boundary Waters*, 164 F.3d at 1128, 1130.

Dardanelle gives a laundry list of direct and indirect impacts it says FHWA ignored. The list: increased truck and train traffic; stalled emergency vehicle transport in Russellville; economic harm to the Port of Dardanelle and other ports; flooding in Dardanelle; impaired drinking water quality in Dardanelle; and induced growth and land use changes in the area. While these topics might not have been front and center in the Impact Statement, nearly all of them got a "full and fair" discussion. 40 C.F.R. § 1502.1. There's a table summarizing FHWA's findings at FHWA AR 011305–1311. Dardanelle criticizes some of FHWA's methods, such as assuming a 12-foot-deep navigation

channel in the Arkansas River and relying on an allegedly flawed floodplain analysis. (The deeper channel is planned, not completed.) But the science—the particulars, and how to analyze them—is left to the "wisdom and experience peculiar to the agency." *Burlington*, 938 F.2d at 200; *see also Friends of the Boundary Waters*, 164 F.3d at 1128.

On Dardanelle's challenge to the cumulative impacts analysis, the record favors FHWA. Dardanelle makes many points, but its main argument is twofold. First, Dardanelle says FHWA confuses cumulative impacts with direct and indirect impacts. The Court disagrees. The Impact Statement handles cumulative impacts separately and with a distinct analytic framework. They're discussed in terms of the likely combined effect of intermodal facilities and other projects—including past, present, and reasonably foreseeable ones—in the area. *E.g.*, FHWA AR 011214-1216; FHWA AR 009025-9033. Second, Dardanelle criticizes FHWA's use of different geographic areas to measure effects on different resources. Some cumulative impacts were studied across all six counties in the river valley region, others only within a particular tract's boundaries. A table showing the geographic area/resource breakdown is in the supplemental draft Impact Statement, FHWA AR 009023-9024. The Court sees nothing wrong with FHWA's varied methods. They're not unreasoned, and identifying geographic areas for a cumulative impacts analysis "is a

task assigned to the special competency of [FHWA]." *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976).

6.      **Miscellaneous Issues.**  None of the three remaining issues entitle Dardanelle to relief.  First, Dardanelle argues that the Corps acted arbitrarily and capriciously by adopting FHWA's Impact Statement instead of completing its own supplemental statement on the harbor.  In August 2014, the Court dismissed the claims against the Corps without prejudice because it hadn't taken any final agency action on the proposed harbor.  № 44.  The Corps had told the Court that it was deciding whether to supplement or adopt FHWA's Impact Statement.  № 35 at 6.  It didn't publicly or officially commit itself to going the supplement route.  The Corps left open the possibility of adopting FHWA's statement, *ibid.*, which it eventually did.

Next, Dardanelle argues that the Corps violated CEQ regulations by allowing gravel mining at the proposed slack water harbor before issuing its Record of Decision.  40 C.F.R. § 1506.1.  Assuming Dardanelle hasn't waived this issue by failing to raise it in its opening brief, this point doesn't change this case's outcome.  The excavation is being done by one private actor, long involved in mining in the area, not the Corps or FHWA;  and NEPA doesn't apply to private actors.  Plus, to the extent Dardanelle challenges the Corps' licensing decisions, that's an issue for a different lawsuit.

Last, Dardanelle says FHWA's reevaluation—completed after the Corps announced some changes to the slack water harbor—purports to confirm all of the findings of the final Impact Statement. This is true, but doesn't make a real difference. A challenge to the reevaluation doesn't create an independent ground to invalidate FHWA's Impact Statement, which the Court has already found valid under NEPA.

\*     \*     \*

Dardanelle's motion to reconsider, № 167, and motion for judgment, № 133, are denied. The Defendants' cross-motions for judgment, № 137 & № 138, are granted. Notwithstanding Dardanelle's hard run at stopping the River Valley Intermodal Facilities Project, the record presents no sufficient legal basis to do so. The amended complaint will be dismissed with prejudice.

So Ordered.

*D.P. Marshall Jr.*
D.P. Marshall Jr.
United States District Judge

8 June 2018

# Appendix A

Figure 3.4. Map of Bend (Purple) Alternative



**FHWA AR 008956**
**(from the supplemental draft Environmental Impact Statement)**

Figure 3.8.    Map of North Dardanelle (Red) Alternative



**FHWA AR 008975**
**(from the supplemental draft Environmental Impact Statement)**

Figure 3.9.   Map of Russellville Bottoms (Green) Alternative



**FHWA AR 008980**
**(from the supplemental draft Environmental Impact Statement)**